UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 1:20-CR-0064(2) |
| | : | |
| Plaintiff, | : | JUDGE MATTHEW W. MCFARLAND |
| | : | |
| v. | : | |
| | : | UNITED STATES' SENTENCING |
| | : | MEMORANDUM |
| JAIME CARDINAL, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

## INTRODUCTION

For years, women and children who were victims of domestic violence could find refuge at My Sister's House (MSH), a nonprofit organization in Washington Court House that was funded primarily through federal and state grants. But all that changed in approximately 2013, after defendant Jaime Cardinal, who was MSH's bookkeeper, and Crystal Chrisman, its executive director, began treating MSH's financial accounts like their personal piggybank. Chrisman and Cardinal spent tens of thousands of dollars on personal expenses, including meals at restaurants (often multiple times per day), repairs and gas for their personal cars, clothing and shoes, and even a trip to Disney World for themselves and their respective daughters. The thefts continued for years, directly affecting MSH's ability to offer services to victims and to pay its staff—and the defendants eventually put MSH in such dire financial straits that it was forced to close its doors forever.

As explained in more detail below, to reflect the seriousness of the offense, including the harm that Cardinal's actions had on some of the most vulnerable members of our community, the

government respectfully requests that the Court sentence Cardinal to 12 months' imprisonment, $25,000 in restitution, two years of supervised release, and a $100 special assessment per count.

## APPLICABLE LAW

The Sentencing Guidelines "should be the starting point and the initial benchmark for choosing a defendant's sentence." *United States v. Demma*, 948 F.3d 722, 727 (6th Cir. 2020) (internal quotations omitted). Accordingly, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). Then, "the district court must weigh and apply the range of factors outlined in 18 U.S.C. § 3553(a)." *Id.* at 49-50. These include (1) the nature and circumstances of the offense and the history and characteristics of the defendant and (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a). The Court should impose a sentence sufficient but not greater than necessary to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *See* 18 U.S.C. § 3553(a).

## FACTUAL BACKGROUND

From about 2004 to 2016, MSH was a nonprofit organization serving victims of domestic violence in and around Washington Court House, Ohio. MSH ran a shelter to house victims, and it also provided information and other resources to victims who did not live at the shelter. It was the only domestic violence shelter in town.

MSH's operations were funded primarily through federal and state grants, including grants under the Violence Against Women Act, the Family Violence Prevention and Services Act, and

the Victims of Crime Act. These grant funds were designated primarily to pay for salaries and benefits for MSH staff, with additional funds awarded for, among other things, supplies, maintenance, and training.

Jaime Cardinal began working for MSH as a volunteer in about 2012. And not long after, in about 2013, Cardinal began conspiring with Crystal Chrisman, MSH's executive director, to steal funds meant for victims and instead use those funds on personal expenses. The fraud was so blatant that MSH's CPA refused to complete an audit for the year ending in December 2013, reporting to MSH's Board that MSH's financial accounts showed so many questionable expenses without supporting documentation that it was impossible to complete the audit.

Despite this warning, the fraud continued, and in 2015 Cardinal began working as a victim advocate and as MSH's internal bookkeeper. In the latter role, Cardinal was supposed to prepare internal bookkeeping records, balance financial statements, and manage payroll. This was a particularly important job given that MSH had to keep careful documentation to show that federal and state grant funds were being used appropriately. But rather than help MSH meet those obligations, Cardinal used her position of trust, and her control over MSH's finances, to further her conspiracy with Chrisman.

The evidence in this case shows that, for years, while Chrisman was executive director and Cardinal was entrusted with managing MSH's finances, the two misused debit cards linked to MSH's bank accounts—money that was supposed to support victims and make payroll—to make personal purchases. For example, on several dates from about January 2014 through about May 2015, Chrisman and Cardinal used MSH funds at online auctions to purchase items for their personal use, including a Floor Maid robotic vacuum, headphones, fitness trackers, a chiminea, and a patio set.

3

Chrisman and Cardinal also used MSH's debit cards to go out to eat almost every day, often charging multiple meals per day to MSH. Many of these personal purchases were made when few, if any, victims resided at the shelter—and that is because, during the course of the fraud, the number of victims MSH served steadily declined, as Chrisman and Cardinal began turning away victims referred to MSH by other agencies. For example, in March and April 2016, when <u>not a single victim was in the shelter</u>, Chrisman and Cardinal charged more than $6,000 to MSH's debit cards for food at restaurants and grocery stores, car repair and fuel for personal cars, weight-loss supplements, groceries, and other personal purchases.

Other examples of charges that Cardinal made on MSH's debit cards include nearly $600 of repairs for personal vehicles; $155 for a pair of shoes; more than $1,200 for makeup, lotion, and other personal items from Avon; and more than $3,100 for iTunes purchases.

Another method Chrisman and Cardinal used to steal money from MSH was by writing checks made out to themselves, to each other, and to third parties. These checks were drawn from MSH's bank accounts, and they falsely purported to reimburse Chrisman and Cardinal, or third parties, for expenses authorized by MSH, when in fact the expenditures were for purchases that had not been authorized. For example, in June 2016, Chrisman caused approximately $2,902.51 in MSH funds to be paid to a third party for the purchase of handbags from retailer Thirty-One for Chrisman, Cardinal, and others.

In furtherance of the scheme, and in contravention of MSH policy, Cardinal and Chrisman either did not submit to MSH's Board of Directors documentation of an expenditure or its purpose, or they submitted only a receipt without explanation of the reason for the purchase. Similarly, Cardinal and Chrisman made it more difficult for MSH's Board of Directors to track the

4

expenditure of MSH funds by purchasing gift cards, including Green Dot cards, and then using those gift cards to make personal purchases.

Another method Cardinal and Chrisman used to enrich themselves was to charge personal expenses to credit cards belonging to Chrisman's parents and then request that MSH reimburse Chrisman's parents for those personal expenditures. For example, in November 2015, Chrisman caused approximately $1,574.73 in MSH funds to be paid to her parents to reimburse them for personal expenses charged to their credit card, including charges at restaurants, gas stations, craft stores, and grocery stores.

In 2016, Cardinal and Chrisman used MSH funds to take their daughters on a vacation to Florida, charging the daughters' plane tickets to MSH. After the trip, Chrisman requested reimbursement from MSH for approximately $2,845.69 in personal expenses the two women and their daughters had charged to Chrisman's parents' credit card while on vacation, including tickets to Disney World and Universal Studios, souvenirs, clothing, alcohol, candy, and meals at restaurants. Cardinal and Chrisman also charged approximately $625.09 to MSH for the rental of a vehicle that their respective daughters used to travel to and from Disney World and Universal Studios.

Due to the thefts, MSH fell behind on payroll and on paying taxes. Several MSH employees reported that, when they asked why they had not received a paycheck, Cardinal and Chrisman told them it was because grant funds had run out.

In approximately November 2016, the Board of MSH placed all employees on administrative leave pending further investigation. MSH—the only domestic violence shelter in Washington Court House—never reopened.

# ARGUMENT

### A.   Guidelines Calculations

The government agrees with the Guidelines calculations in the PSR, which give a Guidelines range of 12 to 18 months' imprisonment, one to three years' supervised release, and a fine of between $5,500 and $55,000. A special assessment of $100 per felony count is mandatory.

### B.   Analysis of the § 3553(a) Factors

The nature and circumstances of this offense weigh in favor of a term of imprisonment, as recommended by the Guidelines. This was not a one-time crime of opportunity, such as an employee's rash decision to steal money from a safe accidentally left open. Rather, Jaime Cardinal and Crystal Chrisman stole money from MSH almost every day for years. They did so while abusing positions of trust within MSH—positions that specifically put them in charge of MSH's finances. They stole money from a nonprofit organization with a relatively small budget, knowing that the money they were using on Avon products and Disney souvenirs was supposed to be helping women and children who were victims of domestic abuse. And they stole so much money that MSH had to close its doors, leaving victims with nowhere to go and putting several MSH employees out of work.

In the government's view, there are no mitigating factors as to the offense conduct itself. Given the frivolous nature of many of the purchases Cardinal made using MSH funds—such as fitness trackers and hundreds of dollars of in-app purchases for the game "Gummy Drop!"—the Court should reject any suggestion that this was a crime of necessity rather than one of convenience. A term of imprisonment would reflect the seriousness of his offense and provide just punishment for it.

6

A term of imprisonment is also necessary to afford adequate deterrence to criminal conduct. MSH received tens of thousands of dollars in state and federal grants every year—but it was just one of thousands of organizations receiving such funds in the United States. Although state and federal governments do their best to audit how recipients use the grants they receive, resource constraints mean it is impossible to independently review and substantiate every expenditure every year; the government must rely at least in part on the good faith and truthful reporting of the grant recipients. By imposing a term of imprisonment, the Court would send a message of general deterrence to others considering converting government grants to their personal use: Stealing grant money, funded by taxpayers and entrusted to your stewardship, will land you in prison.

As for Cardinal's history and characteristics, the government notes that she described a "great" childhood free of abuse or neglect. Although she reported a turbulent first marriage, it ended more than a decade before the offense conduct. Cardinal also reported being married to her second husband, who is employed full-time at Amazon, for the last 20 years. There do not appear to be significant factors in Cardinal's history that would have pushed her toward committing this crime.

Nevertheless, the government recognizes that some mitigating factors relating to Cardinal's health and family obligations may weigh in favor of a shorter prison term than might otherwise be appropriate. The PSR sets out the details of Cardinal's heart condition and other health issues, which may make a prison term more punitive for her than for similarly situated defendants. (*See* PSR ¶¶ 89-91.) It also describes certain family members for whom Cardinal helps to care, and for whom Cardinal will be able to care while on supervised release. (*Id.* ¶¶ 76,

79.) In light of these mitigating factors, the government respectfully submits that a prison term at the low end of the Guidelines, rather than one toward the high end, would be appropriate here.

In light of all of the § 3553(a) factors described above, the government believes that a sentence of 12 months, followed by two years of supervised release, $25,000 in restitution, and $200 in special assessments is sufficient, but not greater than necessary, to meet the goals of sentencing in this case. The requested term of imprisonment will reflect the seriousness of the offense and the harm it caused to victims of domestic violence. It will also promote respect for the law and afford adequate deterrence to others considering taking advantage of government programs meant to help those in need.

## CONCLUSION

For the foregoing reasons, the United States requests that the Court accept the parties' proposed plea agreement order that Cardinal pay $25,000 in restitution to the U.S. Department of Justice Office of Justice Programs and $200 in special assessments. The government further requests that the Court impose a prison term of 12 months followed by two years of supervised release.

Respectfully submitted,

KENNETH L. PARKER
UNITED STATES ATTORNEY

*s/Julie D. Garcia*
JULIE D. GARCIA (CA 288624)
Assistant United States Attorney
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
(513) 684-3711
Julie.Garcia@usdoj.gov